## In re FIRST ACTUARIAL CORPORATION OF ILLINOIS, f/d/b/a A.A. Beaven and Company, Ltd., Debtor.

Bankruptcy No. HG 92–84750.

United States Bankruptcy Court, W.D. Michigan.

May 19, 1995.

---

Larry A. Ver Merris, Grand Rapids, MI, for First Actuarial Corp. of Illinois (briefed and argued).

Stephen W. and Lana G. Pearson, Tempe, AZ, pro se claimants (briefed, but did not appear).

## OPINION RE: DEBTOR'S OBJECTION TO ALLOWANCE OF CLAIM OF STEPHEN W. AND LANA G. PEARSON

LAURENCE E. HOWARD, Chief Judge.

This matter comes before the court on the debtor in possession's objection to the claim of Stephen W. and Lana G. Pearson ("Pearsons" or "claimants"). The Pearsons filed their timely claim in the amount of $292,-904.00 as unsecured creditors. The debtor, First Actuarial Corporation of Illinois, ("First Actuarial" or "debtor") subsequently filed a written objection to the Pearsons' claim for the reason that:

> Debtor has scheduled Claimants' claim as being in dispute since a liability to Claimants was shown on the Debtor's books, but the Debtor also showed that it owned the Capital stock of Pearson Gordon Jones Corporation as an asset as well. The Debtor has not had control of such company since January 1991 when the original sellers of such company, including these Claimants, regained control of such company through action commenced in the courts of the State of Arizona. Since Claimants have now taken back and received control of what they previously sold (the corporation), they should not have any further claims against the Debtor.

The debtor asks that this claim be disallowed in its entirety.

Thereafter, the Pearsons filed a brief entitled "Response to Debtor's Objection to Claim of Stephen W. and Lana Pearson." In that brief, the Pearsons indicated that they would not travel to Michigan for any hearings in this matter. The Pearsons live in Arizona and appear before this court *pro se*.

A hearing on this objection to claim went forward but the Pearsons did not attend. First Actuarial did appear and offered the testimony of its president, John Edward Hansen. The matter was taken under advisement pending the submission of briefs on the issues presented.

The debtor submitted its "Brief in Support of Debtor's Objection to Claim of Stephen W. and Lana Pearson." To that brief, the Pearsons responded with their "Claimants' Response to Debtor's 'Brief in Support of Debtor's Objection to Claim of Stephen W. and Lana Pearson'." All briefs filed contain a number of supporting documents attached as exhibits.

Based on those briefs, the court file, and the testimony taken in open court, the history of the dealings between the debtor and the Pearsons appears to be as follows.

## BACKGROUND

The Pearsons' claim arises out of the sale of their stock in the Pearson Gordon Jones Corporation ("PGJ"). In 1988, the Pearsons were co-trustees of the Pearson Revocable Trust ("Pearson") dated January 23, 1986. Pearson was the owner of 35.72% of the stock in PGJ whose other shareholders were Maurice Gordon ("Gordon"), Donald Jones ("Jones") and Michael Gainer (collectively, "shareholders").

At some point, the shareholders of PGJ were contacted by Raymond Ankner ("Ankner") and G.C. Pettey, III ("Pettey") regarding the possible purchase of PGJ. Ankner is the chairman of First Actuarial's board of directors and its principal stockholder. Pettey was the President of another actuarial company, Custom Benefit Services ("CBS"). Together, Pettey and Ankner were attempting to develop a nationwide actuarial business.

On May 19, 1988, CBS acquired the stock of PGJ. CBS executed a Stock Purchase Agreement as well as Promissory Notes to the shareholders of PGJ. In addition, Ankner and Pettey executed a personal guaranty in the form of a Stock Repurchase Agreement. Besides selling their PGJ shares, Mr. Pearson and the other stockholders executed Covenants Not to Compete. Pearson was to receive $305,060.00 for the Covenant Not to Compete and $280,748.00 for its stock in PGJ.

The Stock Repurchase Agreement required Ankner and Pettey ("repurchasers") to cure any default by CBS by paying the outstanding amounts on the Promissory Notes. In the event of a default by the repurchasers, the stock would revert back to the sellers. Pearson claims that these agreements entitled it to recover the amount of the Promissory Notes reduced by the net book value of PGJ. The debtor disputes that claim.

After the purchase, CBS operated the company for approximately one year. Apparently, Ankner and Pettey decided to discontinue their association with one another. The two decided that CBS would transfer the stock of PGJ to the debtor pursuant to a Settlement Agreement between Ankner and Pettey. Under ¶ III(A) of that Settlement Agreement, First Actuarial assumed all of CBS's obligations under the Stock Purchase Agreement, the Covenants Not to Compete, and the Promissory Notes.

CBS attempted to obtain from the shareholders a formal acknowledgement of the assignment of the stock to First Actuarial. Gordon and Jones signed such an acknowledgment. However, because Mr. Pearson was apparently concerned about losing any remedies against CBS, neither he nor his wife, on behalf of the Pearson Trust, formally acknowledged the assignment. But this did not prevent the assignment from CBS to the debtor. First Actuarial assumed the obligation and made a number of payments to Pearson under the Promissory Notes. Pearson accepted those payments.

After selling his stock in 1988, Mr. Pearson was not involved in the operation of PGJ. CBS did keep Gordon and Jones on as employees of PGJ. During the term of their employment, CBS and/or the debtor made only small interest payments on the obligations to Gordon and Jones.

In February of 1991, after a period of dispute, Gordon and Jones gave the debtor formal notice of default under the Stock Pur-

chase Agreement and Promissory Notes. The debtor failed to cure the default. Therefore, pursuant to the terms of the Stock Purchase Agreement, Gordon and Jones retook control of PGJ.

On February 21, 1991, the debtor filed a complaint for Declaratory Judgment and Application for Preliminary Injunction against Gordon and Jones in Arizona state court ("the First Action"). In that case, the debtor sought an injunction against Gordon and Jones to prevent them from retaking their stock after the debtor and the individual repurchasers of the stock had defaulted. In response, Gordon and Jones filed a counterclaim against the debtor for amounts allegedly owed under the contracts.

On August 12, 1991, Gordon and Jones filed a Motion for Summary Judgment in the First Action. In that motion, Gordon and Jones contended that since the "Net Book Value" of PGJ was a negative number, under the terms of the Stock Repurchase Agreement, they were entitled to recover the full amounts outstanding on the Promissory Notes. Gordon and Jones relied upon a balance sheet for PGJ which the debtor had prepared on December 31, 1990. That balance sheet indicated that PGJ had total assets of $346,730.87 and total liabilities of $1,130,155.57. Therefore, PGJ's Net Book Value was less than zero (i.e. − $783,424.70). The Arizona state court granted summary judgment in favor of Gordon and Jones.

Having lost on summary judgment, the debtor filed a Motion for Reconsideration and an Objection to Defendants' Proposed Form of Judgment. First Actuarial argued that allowing Gordon and Jones to regain their stock in PGJ while requiring the debtor to pay the liquidated damages amounted to a windfall to Gordon and Jones. The trial court denied the debtor's Motion for Reconsideration. The court signed a Judgment dated July 8, 1992 which awarded over $1,000,000.00 to Gordon and Jones. The debtor has appealed the judgment; from the record before me, it appears that the matter remains on appeal. Pearson was never a party to the First Action.

According to Pearson, it never joined the counterclaim in the First Action because the debtor was current in its obligations at the time. Further, Mr. Pearson claims that he had no desire to sue the debtor or reclaim his stock. Unlike Gordon and Jones, Mr. Pearson was no longer an officer or an employee of PGJ. He had not been associated with PGJ for approximately three years. Pearson claims that for these reasons, its interest was different than that of Gordon and Jones. Pearson wanted the debtor to continue running PGJ and to continue making payments under the Promissory Notes. Pearson claims that it would have gained nothing by reclaiming a minority interest in PGJ, a closely held corporation.

The default by the debtor with respect to Pearson occurred later in 1991. On September 6, 1991, Pearson noticed a default under the Stock Purchase Agreement. On October 7, 1991, Pearson noticed a default on the Stock Repurchase Agreement. Pursuant to the terms of the Stock Repurchase Agreement, the repurchasers were given ninety days after notice of default to obtain a *bona fide* offer to purchase Pearson's stock. That ninety day period expired on January 7, 1992.

Pearson argues that the first date it *could* have joined in the First Action was the next day, January 8, 1992. That is the same date as the entry of the state court's Order granting Gordon and Jones' Motion for Summary Judgment in the First Action.

Also in 1991, Gordon and Jones, having previously counterclaimed against the debtor in the First Action, filed a separate complaint against CBS as well as Ankner and Pettey, for amounts allegedly due them under the various contracts. In July, 1992, Pearson filed an action against First Actuarial, CBS, Ankner, and Pettey for damages under those contracts. The two suits were consolidated by the state court in Arizona ("the Second Action").

Apparently, during the pendency of the Second Action, three of the four defendants (i.e. CBS, First Actuarial, and Pettey) filed bankruptcies. Each debtor would have been afforded the protection of an automatic stay. The existence of automatic stays under 11 U.S.C. § 362 with respect to these three

would explain why the state court's findings of fact and conclusions of law in the Second Action dated August 4, 1993 addresses Ankner as the only defendant in the consolidated cases.[1]

Pursuant to the opinion in the Second Action, judgment was rendered against Ankner and in favor of Pearson and Gordon. The judge stated:

> 10. Court does not find that *res judicata* or collateral estoppel from the case of *First Actuarial Corporation v. Gordon Jones* is appropriate.

The question which now arises is what effect, if any, is to be given by this court to determinations made in the Arizona state court actions. The Pearsons assert that since the state court's decision in the First Action was based on the same documents and transactions, the debtor is collaterally estopped from relitigating those issues in this court. The debtor disagrees.

## ANALYSIS

The preliminary issue in this matter is whether this court must give *any* consideration to the prior actions in Arizona. Article IV, section 1 of the Constitution requires that each state give full faith and credit to the public acts, records, and judicial proceedings of every other state. The Constitution also allows Congress to enact laws which prescribe the manner in which such acts, records and proceedings shall be proved and the effect thereof. 3 James Wm. Moore, Moore's Manual ¶ 30.06 (1992). Congress exercised this power in 28 U.S.C. § 1738 which states, in part:

> Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken.

Section 1738 imposes a statutory duty upon federal courts to accord full faith and credit to the judicial proceedings of state courts. Not surprisingly, the issue becomes more difficult in instances where Congress has made federal jurisdiction exclusive.[2]

The power to permit relitigation in the federal courts of issues disposed of by the state courts has been recognized by the Supreme Court in *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 1331–32, 84 L.Ed.2d 274 (1985), reh'g denied, 471 U.S. 1062, 105 S.Ct. 2127, 85 L.Ed.2d 491 (1985); Moore, *supra*, ¶ 30.06. *Marrese* dealt specifically with the issue of whether a state court judgment may have preclusive effect on a federal antitrust claim that could not have been raised in the state court proceeding. *Id.* 470 U.S. at 379, 105 S.Ct. at 1331.

The Supreme Court in *Marrese* found that the full faith and credit statute "directs a federal court to refer to the preclusion law of the State in which judgment was rendered." *Id.* 470 U.S. at 380, 105 S.Ct. at 1332. Therefore, § 1738 requires federal courts, including bankruptcy courts, to preclude relitigation of claims or issues resolved by prior and final judgments rendered by state courts. The federal court which is presented with a final state court judgment

---

1. Paragraph 3 of that document states in part: Defendant G.C. Pettey filed for bankruptcy during the trial and his matter has been stayed. That document makes no specific reference to First Actuarial and CBS, although they were named defendants in the consolidated cases. However, given the date of filing of this bankruptcy, I assume that the state court judge honored the automatic stay and therefore did not address this debtor in his final adjudication.

2. At present the most significant areas include bankruptcy proceedings (28 U.S.C. § 1334), patent and copyright cases (28 U.S.C. § 1338(a)), cases involving fines, penalties, forfeitures, or seizures, under the laws of the United States (28 U.S.C. §§ 1355, 1356), crimes against the United States (18 U.S.C. § 3231), actions and proceedings against consuls and vice consuls of foreign states (28 U.S.C. § 1351), and review of decisions of collectors of customs (28 U.S.C. § 1583). Some provisions for exclusive federal jurisdiction appear outside the Judicial Code. See, e.g. 15 U.S.C. §§ 15, 26 (antitrust actions), 15 U.S.C. § 78aa (cases under the Securities Exchange act), 15 U.S.C. § 717u (violations of the Natural Gas Act), and 40 U.S.C. § 270(b) (suits on bonds under the Miller Act). Wright, *Law of Federal Courts* § 10, at 43–44 (5th ed. 1994).

must give it the same preclusive effect that another state court would give the judgment.

■ Once the determination is made that a state court would give preclusive effect to the prior state court judgment, the federal court must inquire whether any federal statute or policy governing the litigation either expressly or implicitly repeals or creates an exception to the full faith and credit section. *Id.* 470 U.S. at 383, 105 S.Ct. at 1333. The Supreme Court has emphasized that an exception to § 1738 will not be recognized unless a later statute contains an express or implied partial repeal. *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72 L.Ed.2d 262 (1982), reh'g denied, 458 U.S. 1133, 103 S.Ct. 20, 73 L.Ed.2d 1405 (1982).

In this instance, I find no exception to exist that would prevent the use of the preclusion law of Arizona. Therefore, the task of this court is to give to the state court judgment the same preclusive effect as would be given to it under the law of Arizona where it was rendered.

## I. *Collateral Estoppel in Arizona*

■ Under Arizona law, collateral estoppel is available whenever (i) the issue was "actually litigated in a previous suit," (ii) a final judgment was entered, (iii) the party against whom the doctrine is to be invoked had a "full opportunity to litigate the matter and actually did litigate it," and (iv) the issue was "essential to the prior judgment." *Chaney Bldg. Co. v. City of Tucson,* 148 Ariz. 571, 716 P.2d 28, 30 (1986).

### A. *Actually litigated*

■ The debtor's first contention is that the issue upon which it finds support for its objection to the claim has not been "actually litigated". The debtor frames the issue as whether the specific terms of the contracts executed by or assumed by the debtor obligate it to the claimants under Arizona law. (See, debtor's brief in support at pp. 4–5). I disagree. It seems plain that the state court, in the First Action, considered this same transaction and these same documents in determining the rights and obligations between the debtor and Gordon and Jones.

The rights and remedies of the Pearsons would be identical to those of Gordon and Jones as sellers under the original contracts. The only distinguishing factor among the sellers was the amount of their shares of ownership of PGJ. Otherwise, they seem to be identically situated under the contracts.

The fact that the First Action was determined in a summary fashion is not fatal to the "actually litigated" requirement. The Arizona Supreme Court, in *Chaney, supra,* clarified:

> When an issue is properly raised by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated. (citing Restatement (Second) of Judgments § 27 comment d).

716 P.2d at 30.

From the documents provided by the parties, it is evident that the issues of rights and remedies under the various contracts between the purchasers of PGJ and the sellers were raised in the pleadings, submitted for determination, and determined by the state court judge in his summary judgment opinion. Under Arizona law, then, the issue of the rights and remedies afforded to the parties to the various contracts was "actually litigated."

### B. *Final Judgment*

The next requirement is that the judgment upon which the party seeks to rely is final. In this instance, the debtor has noted that the judgment in the First Action is on appeal. The debtor has not argued that the judgment is not "final".

■ In Arizona, *res judicata* effect is given to final judgments of a trial court:

> In order for *res judicata* or collateral estoppel to be applicable there must be a final judgment.... There are some jurisdictions which hold that the filing of an appeal prevents the operation of *res judicata,* but the majority rule is that an appeal from a judgment does not suspend the effect of the judgment as *res judicata* between the parties. (citations omitted).

*Arizona Downs v. Superior Court,* 128 Ariz. 73, 76, 623 P.2d 1229, 1232 (1981).

I find therefore that the judgment in the First Action is final for the purposes of collateral estoppel.

### C. *Full Opportunity to Litigate*

The third requirement for collateral estoppel is that the party against whom the doctrine is to be invoked had a "full opportunity to litigate the matter and actually did litigate it".

■ As stated in *Chaney, supra,* 148 Ariz. at 573, 716 P.2d at 30, when an issue is properly raised by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated.

■ In this instance, it is apparent that the debtor had the opportunity to litigate in the First Action. In fact, the debtor was the plaintiff and actually instituted that action. The debtor lost that action on summary judgment. Certainly, a ruling as a matter of law, based on the pleadings, briefs submitted, and argument of counsel qualifies as "actually litigated." I find that the debtor had the full *opportunity* and did litigate the First Action. Therefore, this requirement for collateral estoppel is also fulfilled.

### D. *Issue Essential to Prior Judgment*

Finally, the last element necessary for the collateral estoppel determination is that the issue in the First Action was "essential to the ... judgment." The issues presented in the First Action between the debtor and Gordon and Jones are identical to the issues presented between the debtor and the Pearsons. Gordon, Jones, and Pearsons' respective causes of action were all based on the same contracts of sale. These identical issues were certainly "essential" to the judgment in the First Action. For that reason, this element of the collateral estoppel test is satisfied.

### II. *Offensive use of collateral estoppel*

■ Collateral estoppel, if invoked, can be used either "offensively" or "defensively". Collateral estoppel is used offensively when a party making a claim attempts to assert against an opponent a determination made by prior judgment to which it was not a party. *Food for Health Co., Inc. v. 3839 Joint Venture,* 129 Ariz. 103, 106, 628 P.2d 986, 989 (Ariz.App.1981). Defensive use of collateral estoppel occurs when a party defending a claim attempts to assert a previous judgment, to which it was not a party, against an opponent who was a party to preclude relitigation of the claim. *Id.* at 107. In this instance, the Pearsons seek to invoke collateral estoppel offensively against the debtor.

Traditionally, collateral estoppel precluded the relitigation of a fact or issue previously determined in a prior suit between the same parties or their privies. *Wetzel v. Arizona State Real Estate Dept.,* 151 Ariz. 330, 333, 727 P.2d 825 (Ariz.App.1986). However, Arizona thereafter abandoned the "mutuality" requirement so that a party precluded from litigating an issue under the traditional rule, was also precluded from doing so with another, provided there was a full and fair opportunity to litigate the issue in the first action. *Id.* (citing Restatement (Second) of Judgments § 29 (1982)).

Arizona courts had recognized this trend, but prior to *Wetzel, supra,* had limited the doctrine of collateral estoppel to its defensive use. *Id.* The *Wetzel* court recognized the developing law and approved the offensive use of the doctrine. *Id.* Section 29 of the Restatement (Second) sanctions both the offensive and defensive use of collateral estoppel by parties not involved in the previous determination:

> A party precluded from relitigating an issue with an opposing party ... is also precluded from doing so with another person unless the fact he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue.

Restatement (Second) of Judgments § 29 (1982).

The rationale for approving the offensive use of collateral estoppel is explained in the comment to section 29 as follows:

A party who has had full and fair opportunity to litigate an issue has been accorded the elements of due process. In the absence of circumstances suggesting the appropriateness of allowing him to relitigate the issue, there is no good reason for refusing to treat the issues as settled. . . .

Restatement (Second) of Judgments § 29, comment b (1982).

The debtor contends that under Arizona law, the offensive use of collateral estoppel is available only in instances where the party raising the doctrine was legally prevented from becoming a party to the prior action. (Debtor's brief at pp. 5–6, citing *Wetzel, supra* ). However, this restrictive reading of *Wetzel* has not been shared by other courts analyzing the doctrine of collateral estoppel in Arizona.

 In an unpublished opinion, the Ninth Circuit has recognized that:

Arizona courts have recently accepted the use of nonmutual offensive collateral estoppel as long as the party against whom preclusion is sought had a "full and fair opportunity to litigate the issue in the prior proceedings." See, e.g., *Wetzel v. Arizona State Real Estate Dep't.*, [151 Ariz. 330] 727 P.2d 825, 828–29 (Ariz.Ct.App. 1986), cert. denied, 482 U.S. 914 [107 S.Ct. 3186, 96 L.Ed.2d 674] (1987); *Chaney*, [148 Ariz. at 573] 716 P.2d at 30 (adopting the Restatement (Second) of Judgments, which allows the use of nonmutual offensive collateral estoppel).

*Hovdestad v. Ward (In re Ward)*, 21 F.3d 1119, 1994 WL 134682 (9th Cir.1994).

While I realize the limited precedential value of unpublished opinions, I make reference to this as it is a recent opinion of the Ninth Circuit which directly deals with this evolving aspect of Arizona law. I, too, decline to

adopt the restrictive reading of *Wetzel* put forth by the debtor. It appears that Arizona law now recognizes the general use of nonmutual offensive collateral estoppel.

### III. *Non–Joinder in the First Action*

 The debtor also contends that Pearson should be denied the offensive use of collateral estoppel for the reason that under Arizona Rule of Civil Procedure 20(a), they "could have legally joined in [the First Action]." (See, Debtor's Brief at p. 6). I am not persuaded by this conclusory argument for two reasons. First, Rule 20(a) is entitled, and deals with, "permissive joinder".[3] Under that rule, while Pearson *might* have conceivably joined in the action, it certainly was not *required* to. Second, apart from its plain reading of Rule 20(a), the debtor has cited no case law in support of its position. I decline to adopt the position that Rule 20(a) precludes the claimants from invoking the principal of collateral estoppel.

Since the debtor's default as to the Pearsons did not become actionable until the same day that the state court rendered summary judgment in the First Action, I find that they were not required to have joined in the First Action.

### IV. *Ruling on this issue in the Second Action*

 Next, the debtor contends that the state court's opinion in the Second Action found that the judgment in the First Action could not be used under the doctrine of collateral estoppel to avoid an analysis of the issues raised in the Second Action. Specifically, the debtor points to ¶ 10 of the Conclusions of Law dated August 4, 1993 which states that *res judicata* and collateral estop-

---

**3.** That rule reads:

Rule 20(a). Permissive joinder

All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action. All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities.

pel from the First Action is not appropriate. (See, p. 182, *supra*). However, I see this argument as being flawed. Since the Second Action was decided *after* the imposition of the automatic stays of the various bankruptcies, it seems to me that the state court judge's comment that collateral estoppel did not apply was limited to Ankner as he was the only remaining defendant in that Second Action. (See, fn. 1, *supra*).

For these reasons, I find that based on the law of the State of Arizona, the application of the offensive use of collateral estoppel is appropriate and the debtor is precluded from relitigating these issues in this court.

In addition to the arguments specific to collateral estoppel, the debtor asserts that it is not indebted to the Pearsons based on the language of the various contracts executed in association with the sale of PGJ. Having dealt with the collateral estoppel issue, I now turn to this final assertion.

### V. *The Debtor is not Indebted to the Claimants*

The remainder of the debtor's assertions that it is not indebted to these claimants is based on the contracts themselves. The debtor attempts to analyze the Stock Purchase Agreement, the Promissory Notes, the Stock Repurchase Agreement, and the Settlement Agreement pursuant to which the debtor assumed CBS's obligations. (See, debtor's brief in support of its objection to claim at pp. 7–14).

Unfortunately for the debtor, an analysis of the various contracts and their effects was precisely the issue in the First Action. Since I have found that collateral estoppel applies in this case, I will not address these arguments because these are the same arguments proffered in the First Action. The debtor is collaterally estopped from having these arguments adjudicated a second time in this court. For me to reconsider these arguments would be to give the debtor a "second bite at the apple" that is precluded by collateral estoppel. These issues have been presented once to a competent court. The debtor had an adequate opportunity as well as incentive to obtain a full and fair adjudication on this argument in the First Action. I find

no compelling need for a redetermination of these issues beyond that already made by the state court.

### CONCLUSION

IT IS HEREBY ORDERED that, for the reasons stated above, the debtor's objection to the allowance of the claim of Stephen W. and Lana Pearson is OVERRULED.

IT IS SO ORDERED.